## Shirk v. City of Lancaster

*Windolph & Mueller*, for plaintiff.

*William B. Arnold* and *H. Edgar Sherts*, city solicitor, for defendant.

GROFF, P. J., June 4, 1932.—The pleadings in this case consist of a bill in equity, filed April 29, 1931, and an amendment thereto, filed June 6, 1931, wherein Frank G. Shirk, a resident of the City of Lancaster, is the plaintiff, and the City of Lancaster, a municipality of the third class, is the defendant.

On July 15, 1931, an answer was filed to the said bill in equity by the defendant, and the issues raised in said pleadings are as follows:

1. Are the water rates fixed by the City of Lancaster reasonable?

2. Can the surplus over and above the cost of operating the water supply system of Lancaster be used for general city purposes?

• • •

On January 27, 1931, the Council of the City of Lancaster, a third class city, by a unanimous vote, passed an ordinance signifying its desire to increase the bonded indebtedness of the City of Lancaster in the sum of $3,250,000, "for the purpose of providing funds for or toward the construction of additions, extensions and improvements to the water supply system and the sewer and drainage systems of the City of Lancaster, Pennsylvania, including therein, among other things, the construction of a rapid sand water filtration plant, additional raw and filtered water storage facilities, and sewage treatment plants; the acquisition of all necessary lands and equipment; and the payment of all land damages and all engineering and professional expenses incident thereto."

Subsequently, on February 3, 1931, the city council, by a unanimous vote, passed an ordinance calling a special election to be held in the city on March 17, 1931, to secure the approval, or disapproval, of the electors to said increase of indebtedness. The election was had on the day named, and a majority of the electors of the city voted in favor of the increase of the said indebtedness.

After the said election, to wit, on March 31, 1931, by ordinance No. 146, an increase in indebtedness in the amount of $1,000,000 was actually made, and on July 21, 1931, the indebtedness was actually increased by ordinance No. 152 another $1,000,000, making the total outstanding actual increase in said indebtedness at the time of the hearing $2,000,000. Of this amount, according to the evidence, $1,032,000 will be expended in the cost of water improvement, and the balance of the $3,250,000 will be expended in sewer improvement.

The same language is used in both ordinance No. 146 and ordinance No. 152, each of which actually increased the indebtedness of the City of Lancaster $1,000,000, which language is as follows:

"For the purpose of providing funds for or toward the construction of additions, extensions and improvements to the water supply system and the sewer and drainage systems of the City of Lancaster, Pennsylvania, including therein, among other things, the construction of a rapid sand water filtration plant, additional raw and filtered water storage facilities, and sewage treatment plants; the acquisition of all necessary lands and equipment; and the payment of all land damages and all engineering and professional expenses incident thereto."

On March 31, 1931, the date on which the indebtedness was actually increased the first $1,000,000, ordinance No. 147 was adopted, in which the water rates of the City of Lancaster were fixed as follows: The charge per quarter for water consumed in the City of Lancaster in quantities of 75,000 gallons, or less, was increased from ten cents per thousand gallons to twenty-five cents per thousand gallons; the next 925,000 gallons was increased from eight cents per thousand gallons to eighteen cents per thousand gallons; and all over 1,000,000 gallons was increased from six cents per thousand gallons to ten cents per thousand gallons.

The estimated receipts from water rents for one year, under the new rates, excluding from said income ferrule permits, service mains, meters and meter repairs, and pipe laying, is $432,000, and including the items above excluded is $452,500. The estimated expenditures for the year 1932, including the watershed, filtration system, pumping system, reservoir, tanks and standpipe, distribution system and general expenses, is $233,804, leaving an excess of estimated receipts over estimated expenditures of $218,696.

By ordinance No. 146 above referred to, there was levied and assessed upon all property subject to taxation for municipal purposes within the City of Lancaster an annual tax of $60,900, to provide for the payment of the principal, the interest and the state tax on the first $1,000,000, and by ordinance No. 152

there was levied and assessed upon all property subject to taxation for municipal purposes within the City of Lancaster an annual tax of $59,700, to provide for the payment of the principal, the interest and the state tax on the second $1,000,000.

We understand that the annual tax for the retirement of both these issues of $1,000,000 is now being collected from the property owners of the City of Lancaster.

After this had been done, to wit, on April 29, 1931, the plaintiff in the bill, Frank G. Shirk, a water consumer, "on behalf of himself and all other citizens and taxpayers of said City of Lancaster who may hereafter join," filed a bill in equity, praying the court as follows:

"1. For a perpetual injunction enjoining and restraining the defendant, its officers, agents, servants and employes from enforcing said ordinance of March 31, 1931, and from collecting the water rates fixed thereby.

"2. For a perpetual injunction enjoining the defendant from fixing or establishing any water rates in excess of the reasonable requirements of its water supply system.

"3. For a perpetual injunction restraining the defendant from using any of the money collected by virtue of the water rates fixed by said ordinance of March 31, 1931, for any purpose other than the reasonable requirements of its said water supply system.

"4. For such other and further relief as to your honorable court shall seem meet and proper.".

As we see the question before us, and after considering the bill and answer, the whole matter resolves in the one question, namely, are the water rates fixed by the City of Lancaster reasonable? If they are, then the bill should be dismissed. If they are not, then the first and second prayers of the bill should be granted.

It seems that the Journal of Council of the City of Lancaster for March, 1931, at page 107, contains the following:

"Mr. Metzger submitted the following message of council, addressed to the citizens of Lancaster, which was, on motion of Mr. Rehm, duly seconded, unanimously approved by council, ordered spread on the minutes and a copy given to the newspapers for publication," namely, "To the citizens of Lancaster: Council of the City of Lancaster has placed before you for approval at the polls next Tuesday, March 17th, a proposal to issue bonds in the sum of $3,250,000 to make vitally needed sewer and water improvements. . . . In concluding, may we repeat several facts on which the voice of council has already been heard: 1—There will be no increase in tax millage if the bond issue passes. Interest, retirement and operating charges will be met out of water rates."

On the hearing of the case, the mayor testified that was the correct report of the message referred to.

On February 17, 1931, the Council of the City of Lancaster adopted the following resolution: "That it is the opinion of the city council that for the purpose of defraying the expenses of the water and sewer improvements, and the retirement of the loan, that water rates be increased in accordance with the table of figures which the mayor will submit to the public at an early date." Those rates are as hereinbefore set forth.

From these resolutions, which appear in the journals of council, and which were offered in evidence, we find that the first $1,000,000 necessitated a tax of $60,900 for the retirement and payment of taxes and interest on said bonds, and that the second $1,000,000 necessitated a tax of $59,700, or $120,600 for the retirement of the two $1,000,000 bond issues, the interest thereon and the taxes.

Only $1,032,000 of the entire increase in indebtedness is to be used for the improvement of the water system. The cost of carrying this amount of loan, were the amounts for interest, retirement and expenses to be deducted from water rents, instead of from taxes levied for that purpose, would be, in round figures, $62,000, and would leave in figures, generally speaking, from the earnings of the water department $156,000, for the purpose of retiring and paying the interest and taxes upon the balance of the loan of $3,250,000, which will not be used for water purposes. But the retirement and payment of interest and taxes on the loan is already provided for by general taxation. This result is in accordance with the statement of the mayor and the resolutions of council above referred to.

This surplus earnings, according to the evidence in the case, is placed in the general fund of the city and is checked therefrom for various purposes, such as the building of streets, paying of salaries, etc. We think it would be a better practice if the city would keep a separate account with its water department.

In the case of City of Pittsburgh v. Phelan, 85 Pa. Superior Ct. 548, it was held: "Water rents are not taxes, nor can the mere consumption of water be regarded as a municipal improvement."

That case follows the case of Jolly v. Monaca Borough, 216 Pa. 345, in which it was held that:

"Water rates paid by consumers are in no sense taxes, but are nothing more than the price paid for water as a commodity. The obligation to pay for the use of water rests either on express or implied contract on the part of the consumer to make compensation for water which he has applied for and received, on the terms and conditions made public."

In School District of Bedford Borough v. Schnably et al., 89 Pa. Superior Ct. 486, 494, Judge Cunningham, in delivering the opinion of the court, said:

"A tax is a demand of sovereignty but a water rent required by a municipality to be paid to it by consumers is merely the price of a commodity, a compensation demanded by the owner of a utility for service rendered."

The same question was decided in the same way in Rieker v. The City of Lancaster et al., 7 Pa. Superior Ct. 149, and repeated in City of Pittsburgh v. Phelan, 85 Pa. Superior Ct. 548.

If it costs $60,900 to carry and retire the first $1,000,000 of bonds issued and used in the construction of the water system, and approximately $2000 additional to carry and retire the $32,000 used from the second $1,000,000 of bonds issued, both of which amounts are raised by general taxation pursuant to the constitutional requirements, and that tax is paid into the general fund of the city, and the income from the water rents exceeds the expenditures by the amount of $218,696, after improvements, extensions, etc., are made, as they apparently are from the items set forth in the evidence, and that amount is paid into the general fund of the city and used for general purposes, then we conclude that it reduces the city tax by that amount, and being used for general purposes of the city ordinarily paid for out of the city tax levied for the purpose of carrying on the business and transactions of the city, the $218,696, the surplus of water rents, is substituted for and becomes a tax itself.

As an illustration, A owns a property worth $25,000, and B owns a property worth $5000. They both consume the same quantity of water, and both pay the same water rate, each paying $100. According to the evidence, fifty per cent. of this, or $50, from each party is substituted for that amount of tax and applied to the payment of the general operation of the city government. If this $50 was raised by taxation, A's property being worth five times as much as B, A would pay five times as much city tax as B, but the money being raised by water rates,

B pays as much into the general fund for general city purposes as A and is, therefore, considering the value of his property, contributing five times as much out of his $50 toward general city purposes as A is contributing. In other words, their position so far as taxation is concerned, is reversed, and B is paying out of his $50, which he pays into the general fund of the city, over and above the amount necessary to pay for his water, five times as much toward the paying of the general expenses of the city government as he should.

We find in Ballentine's Law Dictionary that a tax is "an enforced contribution of money or other property, assessed in accordance with some reasonable rule of apportionment by authority of a sovereign state on persons or property within its jurisdiction, for the purpose of defraying the public expenses."

The $218,696 contributed from the water rates to the general fund and taken therefrom for the purpose of defraying the public expenses certainly does not meet with this definition of taxes. Nevertheless, it is so used.

There is nothing appearing in the evidence, but the approximate assessed valuation of property subject to taxation in Lancaster is, as is well known, $110,000,000, and the amount contributed from water rates, over and above the cost of retiring the bonds, paying the interest and the taxes thereon, would be 1½ mills on the taxable value of the real estate. It must be remembered also that the $60,900, which we have allowed for the retirement of the bonds, is collected from a general tax on this assessable property, so that the city is getting the $60,900, first, from the water rents, and, second, from its tax assessment.

We realize the courts have held that the city can make a fair profit from its water rents, and that the Supreme Court, in Barnes Laundry Co. *v.* Pittsburgh et al., 266 Pa. 24, held:

"When rendering the same character of service as public service companies, municipalities for many purposes must be considered and treated like private corporations; but, for purposes of supervision over their internal management, they may justifiably be put on a different basis from ordinary public service companies; for, though engaged in rendering the same kind of service as the latter, and entitled to derive therefrom a just gain, municipalities are supposed to act primarily for the public good—not to earn dividends; . . ."

It is generally understood that the waterworks of a city are financed along quite different lines from those of a private corporation. Each individual taxpayer has contributed his share to the construction and erection of the water supply machinery, and, the citizens having contributed their share, it is not entitled to receive from the investment a dividend in a sense that the stockholders of an ordinary corporation are entitled. It would not be entitled to more than is sufficient to take care of repairs, extensions, etc.

In the case of City of Cincinnati et al. *v.* Roettinger, 137 N. E. 6, 8, the Supreme Court of Ohio said:

"It is important at this point to inquire into the nature of rates and charges which are in excess of an amount sufficient to pay the cost of the operation of the waterworks and to make provision for repairs, renewals, extensions, new construction, and interest and principal of debt arising out of construction."

While we assume that it is universally conceded that rates and charges not in excess of the amount necessary to meet such purposes are not classed as taxes, as we have above held them to be, it does not follow that such excessive amount would not be classed as taxes. While it is quite well established that charges for service and conveniences rendered and furnished by a municipality to its inhabitants are not taxes, yet where the charge is in excess of the entire cost of the service and convenience, the reason for the rule no longer prevails.

A water rate exacted for actual consumption is merely the price of the commodity, and when in an amount which fairly compensates, the cost can have no proper relation to those revenues which are expended for the equal benefit of the public at large, and it should not be placed in the same classification with burdens and charges imposed by the legislative power upon persons or property for the purpose of raising money for general governmental purposes. Taxation refers to those general burdens imposed for the purpose of supporting the government, and the method of providing the revenues which are expended for the equal benefit of all the people. It must, therefore, be apparent that when the general expenses of the city are taken from excessive revenues realized from water rents and applied to the general expenses of the city, they do become taxes.

It was decided in Rieker v. The City of Lancaster et al., 7 Pa. Superior Ct. 149, at a time before the City of Lancaster became a third class city, that, "A city may adopt such rules in regard to the use of water or payment therefor, as the municipal authorities shall deem expedient." At page 158 of the same case the court further decided that there is nothing "illegal or reprehensible in the city so operating the waterworks as to make a profit thereon," but under the cases this profit must be reasonable.

In Jolly v. Monaca Borough, 216 Pa. 345, the court decided that:

"A borough which has established waterworks of its own has a right to impose by ordinance reasonable rates and charges for the supply of water furnished by it to the residents of the borough."

Considering the present case, if these bonds are retired and the interest and taxes paid by the tax assessed for that purpose, then according to the evidence in the case the city has a clean profit of $218,696. If we deduct from that the amount necessary to retire the bonds, the city still has a profit of $157,796, but will, in addition to the said profit, have in its general fund the amount of tax collected for the retirement of the bonds, namely, $60,900, which means a profit from the transaction of $218,696, the same as above stated.

We feel, and find, that this is an unreasonable amount of net earning for the city to make from its water rents, for the reason of the inequality which it creates in the reduction of taxes, as illustrated above, and as cited by the plaintiff in his brief from Water Works Engineering, as follows:

"For example, a small laundry, probably just making ends meet, might be forced to pay an assessment far greater than, perhaps, a shoe factory, which employed a hundred times as many men, and did proportionally greater business, but which used less water."

From an examination of the Act of June 16, 1836, P. L. 784, we conclude that we have jurisdiction in this case, not to fix a rate, but to determine whether the rates fixed and charged by the city are reasonable or unreasonable.

In American Aniline Products, Inc., v. Lock Haven, 288 Pa. 420, the Supreme Court held:

"As to such municipalities [municipalities operating waterworks] the courts have the power to determine questions relating to service and rates, where the complaint is based on reasonableness of the ordained rate, or the justness of their application, or discrimination amounting to confiscation."

This case is based upon the reasonableness of the ordained rates. We, therefore, have jurisdiction in the case, and having jurisdiction, and from a consideration of the whole matter, we conclude that the rates ordained and fixed by the city are not reasonable rates.

## Conclusions of law

1. A water rate is not a tax, but is a charge for a commodity sold, and the defendant may not lawfully use the proceeds of exorbitant water rents for purposes unrelated to the needs of its water supply system.

2. Water rates paid by consumers are in no sense taxes, but are nothing more than the price paid for water as a commodity. The obligation to pay for the use of water rests either on express or implied contract on the part of the consumer to make compensation for water which he has applied for and received, on the terms and conditions made public.

3. Although engaged in rendering the same kind of service as a public service company, and entitled to derive therefrom a just gain, municipalities are supposed to act primarily for the public good—not to earn dividends.

4. A court of equity has jurisdiction to entertain a bill by a citizen who complains that a municipality has unlawfully arrogated to itself the right to make and enforce unreasonable and discriminatory water rates to his prejudice.

5. As to municipalities operating waterworks, the courts have the power to determine questions relating to service and rates, where the complaint is based on reasonableness of the ordained rate, or the justness of their application, or discrimination amounting to confiscation.

6. Where the charge for water is in excess of the entire cost of the service and convenience, it becomes a tax, and not a charge for water.

7. The rates ordained and charged by the City of Lancaster for water, considering the cost of operation, maintenance, etc., and the total income, are unreasonable.

## Decree nisi

And now, June 4, 1932, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows: (1) that the water rates ordained and established by the City of Lancaster are unreasonable; (2) that the City of Lancaster, its officers, agents, servants and employes, be enjoined and restrained from collecting the water rates fixed by ordinance No. 147, ordained and adopted on March 31, 1931; and (3) that the city of Lancaster pay the costs of this proceeding.

From George Ross Eshleman, Lancaster, Pa.